# 2005-2008

# HIGHWAY-HEAVY, UTILITY AND TUNNEL

# AGREEMENT

# BETWEEN

# LABORERS INTERNATIONAL UNION

# OF NORTH AMERICA

# UPSTATE NEW YORK LABORERS

# DISTRICT COUNCIL

# LOCAL 210

# AND

# THE EMPLOYER

# TABLE OF CONTENTS

**ARTICLE**                                                                 **PAGE**

| | | |
|---|---|---|
| I. | Liability | 1 |
| II. | Definition | 1 |
| III. | Geographic Jurisdiction | 4 |
| IV. | Union Jurisdiction | 4 |
| V. | Pre-Job Conference | 6 |
| VI. | Union Rights | 7 |
| VII. | Management Rights | 10 |
| VIII. | Work Conditions | 10 |
| IX. | Hours of Work | 11 |
| X. | Show-Up Time | 12 |
| XI. | Payday and Mode of Payment | 13 |
| XII. | Laborer Foreman | 13 |
| XIII. | Subcontracting | 13 |
| XIV. | Safety | 14 |
| XV. | Pension, Welfare, S.U.B., Annuity, Training Funds | 15 |
| XVI. | Status Quo on Certain Equipment | 19 |
| XVII. | Strikes and Lockouts | 20 |
| XVIII. | Grievance and Arbitration | 20 |
| XIX. | Deductions | 21 |
| XX. | Equal Employment Opportunity | 22 |
| XXI. | Savings Clause | 22 |
| XXII. | Wages | 23 |
| XXIII. | Successors | 26 |
| XXIV. | Drug Testing | 27 |
| XXV. | Tunnel Work | 29 |
| XXVI. | Apprentices | 32 |
| XXVII. | Duration and Termination | 33 |

## PREAMBLE

THIS AGREEMENT, made the 1st day of April, 2005, by and between _____

_____ (hereinafter called "Employer"), and Laborers Local 210 of the LABORERS INTERNATIONAL UNION OF NORTH AMERICA, affiliated with A.F.L.-C.I.O., (hereinafter the term "Union" shall mean Laborers Local 210).

The parties recognize that this is a pre-hire agreement under section 8(f) of the National Labor Relations Act.

## ARTICLE I - LIABILITY

1.     The Employer recognizes the Union as the exclusive collective bargaining agent for all employees who now and in the future perform work described in this Agreement.

2.     The Employer, whether as a partner, controlling officer, controlling director, controlling stockholder or controlling employee, agrees to be bound by the terms and conditions of this Agreement although doing business under another trade name, or as a partner or controlling officer, controlling director, controlling stockholder, or controlling employee of another corporation or as a joint venturer.

3.     When the Employer performs any work outside of the Union's geographic jurisdiction as defined in Article III of this Agreement, the Employer shall abide by the terms and conditions of the applicable collective bargaining agreement in that area to which a subordinate Union of the Laborers International Union of North America is a party.  If no such collective bargaining agreement exists, the Employer shall abide by the applicable terms and conditions established between the Employers and a union affiliate of the Laborers International Union of North America in that area.  The foregoing shall apply, however, to such agreements and practices which do not violate the National Labor Relations Act, as amended.

## ARTICLE II - DEFINITION

1.     This Agreement is to cover all Highway and Heavy Construction which for the purposes of this Agreement is defined as including, but not limited to, the construction of: highways, roads, streets, bridges, alleys, grade crossings, driveways, sidewalks, curbs, guard rails, fences, culverts, parkways, parking areas, runways, taxiways, ramps and aprons and related work for excavation for conduit, bases and foundations for lighting and water lines and deicing systems; athletic fields; highway and railroad and similar structures; railroad and street railway projects; sewers; sewage treatment projects; sedimentation beds; water mains, grade separations, foundations incident to the work herein described, abutments, retaining walls, viaducts, track elevations, elevated highways, drainage and reclamation projects; reservoirs and water supply projects; pumping stations; power plants; tank farms; bulk plants; pure water projects; hydro-electric developments, water power

developments, transmission lines, duct lines, pipelines, docks. dams, dikes, levees, revetments, irrigation and flood control projects, channels, channel cutoffs, dredging projects, jetties, break waters, locks, piers, piledriving, industrial sites, school sites, building site work; chemical cleanup; landfills; chemical destruction plants and related work; hydro intakes; and all earth moving, including the installation, operation, maintenance and disassembly of construction equipment and plants used in connection with and servicing of the aforementioned work. This Agreement shall also cover all work traditionally performed by laborers.

2.      This Agreement also covers all Utility Construction which for purposes of this Agreement is defined as including, but not limited to:

(a)     The preparation of trenches, footings, etc. for cross-country transmission by pipelines or electric transmission by pipelines or electric transmission or underground lines or cables.

(b)     The loading, unloading, carrying, distributing and handling of all rods, mesh and material for use in reinforcing concrete construction.

(c)     Trenches, Manholes-Cutting of streets and ways for laying of pipes, cables or conduits for all purposes; digging of trenches, manholes, etc.; handling and conveying all materials; concreting, backfilling, grading and resurfacing and all other Labor connected therewith. Clearing and site preparation as described herein.  Cutting or jackhammering of streets, roads, sidewalks or aprons by hand or the use of air or other tools.  Use and maintenance of all non-self-propelled and self-propelled walk behind concrete saws except on Heavy and Highway work only, use and maintenance of non-self-propelled walk behind concrete saws.  Concrete wall cutting saws, concrete and black top coring equipment (except truck or machine mounted), tending, drilling and coring equipment when such work is required to be performed by the Employer, tending all augers and casings on drilling rigs when such work is required to be performed by the Employer.  Digging of trenches, ditches and manholes and the leveling, grading and other preparation prior to laying pipe or conduit for any purpose. Loading, unloading, sorting, stockpiling, wrapping, coating, treating, handling and distribution of water mains, gas mains and all pipe including placing, setting and removal of skids. Cribbing, driving of sheet piling, lagging and shoring of all ditches, trenches and manholes. Handling, mixing or pouring of concrete and handling and placing of other materials for saddles, beds, or foundations for the protection of pipes, wires, conduits, etc. Backfilling and compacting of all ditches, resurfacing of roads, streets, etc., and/or restoration of lawns and landscaping, welding, joining, underwater cable installation.

2

(d)     Sewers, Drains, Culverts and Multiplate - Unloading, sorting, stockpiling, coating, treating, handling, distribution and lowering or raising of all pipe or multiplate.  All digging, driving of sheet piling, lagging, bracing, shoring, and cribbing; breaking of concrete backfilling, tamping, resurfacing and paving of all ditches in preparation for the laying of all pipe.  Pipe laying, leveling and making of the joint of any pipe used for main or side sewers and storm sewers.  All of the laying of clay, terra-cotta, ironstone, vitrified concrete or other pipe and the making of joints for main or side sewers and storm sewers and all the pipe for drainage.  Unloading, handling, distribution, assembly in place, bolting and lining up of sectional metal or other pipe, including corrugated pipe.  Laying of lateral sewer pipe from main sewer or side sewer to building or structure.  Laying, leveling and making of the joint of all multicell conduit or multi-purpose pipe.  Cutting of holes in walls, footings, piers or other obstructions for the passage of pipe or conduit for any purpose and the pouring of concrete to secure said holes.  Digging under streets, roadways, aprons or other paved surfaces for the passage of pipe, by hand, earth auger or any other method and manual and hydraulic jacking of pipe under said surfaces. Installation of septic tanks, cesspools and drain fields.  Oil, brine, chemical transmission lines and related work, fiber optics, communication lines.

(e)     Drilling and Blasting - All work of drilling, jackhammering, and blasting. Operation of all rock and concrete drills, including handling, carrying, laying out of hoses, steel handling, installation of all temporary lines and handling and laying of all blasting mats.  All work in connection with blasting, handling and storage of explosives carrying to point of blasting, loading holes, setting fuses, making primers and exploding charges.   All securing of surface with wire mesh and any other material and setting of necessary bolts and rods to anchor same.  All high scaling and other rock breaking and removal after blast. Handling and laying of nets and other safety devices and signaling, flagging, road guarding.  Waterproofing.

(f)     Signal Men - Signal men on all construction work defined herein, including traffic control signal men or flagmen at construction sites.

(g)     Use of Tools - Operation of all hand. pneumatic, electric, motor combustion or air-driven tools or equipment necessary for the performance of work described herein.

(h)     This Agreement shall also cover all work traditionally performed by Laborers.

3

3.     This Agreement also covers all removal, abatement, encapsulation or decontamination of asbestos, lead and other toxic and hazardous waste or materials which shall include but not be limited to: the erection, building, moving, servicing and dismantling of all enclosures, scaffolding, barricades, decontamination units, negative air machines, etc.; the operation and servicing of all tools and equipment normally used in the removal or abatement of such waste or materials, including, without limitation, negative air machines; the sorting, labeling, bagging, cartoning, crating, packaging and movement of such waste or materials for disposal; the clean up of work site, including decontamination of equipment, and all other work and stand-by time incidental to the removal, abatement, encapsulation or decontamination of such waste or materials; and the performance of safety watch duties on job sites where work is performed under this Agreement.

4.     This Agreement shall also cover all work traditionally performed by watchmen to the extent not prohibited by Section 9(a) of the National Labor Relations Act.

5.     This Agreement also covers Tunnel work.  Tunnel work is specifically defined by Article XXV of the Agreement.

## ARTICLE III - GEOGRAPHIC JURISDICTION

This Agreement covers all Heavy and Highway, Utility and Tunnel Construction work in the County of Erie.

## ARTICLE IV - UNION JURISDICTION

This Agreement is to cover all watchmen, flagmen (all crafts), fire watchmen, traffic control men, laborers, foremen (grade, pipe concrete, forms, seeding, asphalt, clearing and grubbing, clean-up stone-laying) in the performance of:

1. The laying of all types of pipe and conduit; the spreading and pouring and raking and tamping of all asphalt and concrete materials and the bull floating (strike off) of all concrete; the laying of all types of stone or manufactured curb, rip-rap paving blocks, concrete blocks (paving), slope paving, Belgium Block; assembling and placing of Gabion and all similar types of baskets; the handling, the loading and unloading and stringing of all materials, the handling, loading and stringing of all wood products by hand or power pallet jack or similar device; the sharpening of all air tool bits and drills and bull points; the operation of Bo Mag type rollers on all materials except topcoat asphalt; the operation of all remote controlled rollers up to 3,500 pounds (per manufacturers' specifications); any and all types of heaters, including radiant heat (thawzall), to be tended and handled and fueled by laborers at all times when in use.  The laying, spreading and storing of all tarpaulins; the handling, the laying and placing of forms used for curbing, gutters, roads and sidewalks and the stripping of same; the placing, setting and maintenance of all flares, blinker lights and reflectors; the cutting and chipping of road joints; the handling, the loading and unloading and distributing and erection of chain-link fence; handling and erecting of wire fence; overhead signs; handling and placing of wire mesh on roads and

4

bridges; guard rails; the sandblasting and applying of sealers and hardeners and epoxy on concrete and asphalt work; asphalt striping and other asphalt painting; the loading of and the nozzle operations on sandblasting and guniting operations; the signing of all materials (manufactured or otherwise which is handled or put in place by laborers, the handling, the loading and unloading and distribution and installation of all guard rails, highway signs and road markers; tending, handling and fueling single diaphragm pumps and pumps up to and including 2" pumps; laying out, moving, connecting, storing and handling all hoses for all pumps; the operating of all types of machines used to seal any type of joints; the operating and servicing of mortar mixers (including, but not limited to, maxi mixers and/or mega mixers) and conveyers used in laborers' work regardless of number; the operating and servicing of rock drilling machines; the blasting and dynamiting of all rock; welding (excluding machinery, tools, structural steel); installation of manholes and catch basins; the placing of all pre-cast and pre-stressed materials except when placed or installed by the manufacturer pursuant to its collective bargaining Agreement; handling, unloading, loading, assembling and laying of all multiplate; the operating of all air, gas, electric, oil and other types of motor driving tools including all pusher type equipment; use and maintenance of all non-self propelled and self-propelled walk behind concrete saws; except on Heavy and Highway work only, use of non-self-propelled walk behind concrete saws. Concrete wall cutting saws, concrete and black top coring equipment (except truck or machine mounted); tending, drilling and coring equipment when such work is required to be performed by the Employer; tending all augers and casings on drilling rigs when such work is required to be performed by the Employer; the handling, tending and maintaining of generators of up to 10 kilowatts, lasers and any other instruments when used for transferring and alignment of grade from primary lay out; landscape nurseries; sound barrier installation; demolition or dismantling for scrap purposes; hazardous waste work to include chemical cleanup, drum handlers, transformers, divers, infra-red destruction machines, plasma arc plants, warehouse storage loading and unloading, safety men, asbestos removal, video x-ray operation; the unloading, loading, handling, stringing, tending and the installing, erecting, placing, setting and laying of all brick, all block, all stone and all other masonry products; the paving of all stone and brick products; IBC barrier, except on structures; the operating and maintaining of all walk behind curb machines; hose on a vacuum truck, scissor lifts, and all aerial man lifts as a tool of the trade. Set up and use of all grade and pipe lasers, all grade foreman, watchman and all site security, when such security is directly employed by the Employer, it is expressway understood however that the employer retains the right to employ security services on a contract basis and that such arrangements are not subject to this Agreement's subcontract clause; transfer of grades; all pulling of lines regardless of type. All pallet jacks, pump and electric, for moving of materials. All grout mixers 3 cubic feet and under, mortar, and concrete mixers ½ cubic yard or under and all mortar, grout and concrete mixers traditionally operated by laborers, regardless of size. Operating all maxi mixers. Tending all maxi mixers and on site batch plants. Loading and hose control of all hydro seeders; use of all chain blade concrete saws (chain saw type) hand held or bracket mounted. All core drilling except for that performed by testing services. All pipe fusion and operation of fusion machines. Drivers of all gators, pick up trucks and ATV's for site stock and parts retrieval. All parts carriers and runners onsite and off. All dingo type machines, power shovels, walk behind power shovels, walk behind post diggers

and walk behind ditching machines. All decontamination. All material testing and core drill test holes performed by the Employer. Setup, maintenance and dismantling of all hydro mobile and draco mobile scaffold systems fourteen feet and below. All walk behind compactors 3,500 pounds and below; plate and roller; hands on and remote control; on all materials. Control of the back end on all blacktop pavers in use with all materials; screws, grade controls and screen. Operation of the air powered dowel drill and ancillary equipment.

2. In addition to the actual removal or encapsulation of hazardous material, all work tasks associated with any and all safety requirements and final clean-up and disposal of such hazardous waste material. All decontamination of equipment used on hazardous material shall be performed by Laborers. All sludge removal, containment cleaning and removal of heavy metals, phenols, PCB's paint sludges, methylethyl keystones, penatclorophenols, fuel oils, phenolictars, arsenic bearing waste, solvents, calcium, hydroxides, ferro chrome, silicon alloy, dust and slag. Ferro manganese slag, ferro chrom, dust, all carbon materials, aluminum chlorides, rocket fuel spills, fly ash sand, plastic molds, solidified clays, waste waters, sewage sludge, peroxides, keetox and oxylite waste, foundry sands, hexachroetrhanes, cooling water, spent catalyst, contaminated soils, lube and hydraulic oils, pickle liquor, lime sludge, mill scale, drummed chemical waste, carbolic acids, iron salts, toluene, cutting oils, vinyl chlorides, trichloroflorometanes, DDT, all organic phosphates, sulfur compounds, all waste from lagoons, offgrade products, carbonfurans, primary inorganics. Thidans, TCP's brine sludge, sewer pumps, all polymer blends, all environmental protection agency classified waste products and all future classified waste products by any Federal or State Regulatory Agency. The containment of, transfer, stockpiling, burning, destruction, charging or neutralizing machines, BIO-GENETIC, or landfilling, operation of all machines and manual work shall be the work of the Laborer. All water trucks and dust control, all hoses and the loading thereof when not performed by Teamsters.     The foregoing applies in the performance of all the aforementioned work and all other work coming under the jurisdiction of LIUNA unless state, local or owner requirements dictate otherwise. This Agreement shall also cover work traditionally performed by laborers.

## ARTICLE V - PRE-JOB CONFERENCE

1.     There shall be a mandatory pre-job conference which shall be held at least forty-eight (48) hours prior to the commencement of any work on the subject project. However, when the Employer itself receives less than forty-eight (48) hours notice of a job's start time, the pre-job conference shall be held as soon as reasonably possible. This shall apply to any and all subcontractors.

2.     The Employer shall provide information at the pre-job conference including, but not limited to the job locations, the date the job is to commence, the type of work to be performed, the expected duration of the job, the expected number of laborers to be employed, how many shifts, the hours of each shift, the name of the person at the job site

6

to whom employees are to report, and the name of the general contractor on the job site. The Union will designate a Shop Steward at the pre-job conference.

3.      In the event that an Employer violates this Article, the Union may serve a three (3) day notice of its intention to strike on such Employer. If the Employer does not comply within (3) days, the Union may strike such Employer without such action being a violation of the no-strike clause of this contract.

4.      Where a subcontractor has not had a pre-job conference, the three (3) day notice shall also be served on the prime contractor.

5.      The provisions of this Article shall also apply to any and all subcontractors of the Employer.

## ARTICLE VI - UNION RIGHTS

1.      It shall be a condition of employment that all employees of the Employer who perform work covered by  this Agreement shall become or remain members in good standing of the Union or shall pay uniform initiation and agency fees on or after the eighth (8th) day following the date of execution of this Agreement, or after the eighth (8th) day following the beginning of covered employment. The Union agrees that all employees will be accepted to membership or its roster of eligible laborers on the same terms and conditions generally applicable to other members or laborers on its roster of eligible laborers and, further, that the Employer will not be requested to discharge an employee for reasons other than such employee's failure to tender the periodic dues or fees uniformly required.

2.      The Employer agrees to discharge, upon receiving seven (7) days' written notice, signed by the Secretary-Treasurer of the Union, any employee with respect to whom such notice may state that such employee has failed to tender uniform initiation and agency fees uniformly required, provided that said written notice is also provided to said employee and that said employee has not paid the required initiation and agency fees within seven (7) days of the date of the written notice. The Union shall indemnify and hold the Employer harmless for any financial liability arising from the Employer's compliance with such notice.

3.      (a)      Whenever an Employer requires employees to perform work covered by this Agreement on any job, the Employer shall notify the Local 210 Hiring Hall either by telephone or in writing (on a form to be supplied by the Union to all signatory Employers) stating the job location and the number and type of employees required.  The Employer shall at all times be the sole judge as to the work to be performed and whether such work performed by the employees is or is not satisfactory.  It is further understood that the Employer shall not

discharge or reject a Shop Steward appointed by the Union without prior approval of the Union Business Manager.

(b)     The first Employee on any job site shall be a Foreman selected by the Employer.  The second Employee on a job site shall be a Shop Steward appointed by the Union.  Commencing with the third Employee on a job site, 50% of all Employees shall be furnished and referred by the Union to the Employer from the out of work list and 50% shall be selected by the Employer.  All Employees hired by the Employer shall be listed on the out-of-work list. The out-of-work list shall be maintained by the Union and shall be based upon one or more of the following elements: length of service in the industry; skills, residence and availability in the region, prior work for the requesting Employer; and availability.

(c)     An applicant shall be qualified, and thus eligible for employment, only if that applicant (1) has not been previously discharged for cause or rejected in writing by the Employer; and (2) has all current documentation, licenses or certificates required to be eligible to work or to perform the work that is the subject of the Employer's request to the Union. The Union agrees to keep the documentation, licenses or certificates on file and to provide copies to the Employer upon request but does not warrant their validity or relieve the Employer of its responsibility to verify the information provided.

(d)     The Union shall fill Employer referral requests and dispatch to the Employers qualified employee applicants in order of their registration on the out-of-work list.

(e)     Whenever the Union fills an Employer's request for employees, either by referral from the Union or by agreeing to a request by name by the Employer, the Union shall provide to the Employer written notification, to be sent to the Employer by facsimile, stating each employee's name and work classification, and the start time, date, and location of the job to which each employee has been dispatched.

(f)     Each applicant referred to an Employer shall be given a written dispatch slip by the Union confirming his or her dispatch to the Employer, his or her work classification, and the specific request the dispatched applicant is filling. It is understood that the Employer shall hire whomsoever the Employer sees fit and that the Employer shall at all times be the sole judge as to whether the work performed by an employee is or is not satisfactory.  All employees performing work covered by this Agreement hired by the Employer shall be listed on the out-of-work list.  The Union shall not knowingly refer or dispatch

8

any employee then currently employed by any other Employer working under an Agreement with the Union.

(g)     The Employer has the right to refer employees to the Union to be added to the out-of-work list.

(h)     The Employer may not discharge a Shop Steward without the prior approval of the Union's Business Manager or Trustee.

(i)     The job referral system set forth in this Article will be operated in a non-discriminatory manner and in full compliance with federal, state, and local laws and regulations which require equal employment opportunities and non-discrimination. All of the foregoing hiring procedures, including related practices affecting training, will be operated so as to facilitate the ability of the Employers to meet any and all equal employment opportunity/affirmative action obligations imposed by state or federal law.

4.     It is agreed that on each job the Union Business Manager shall appoint a working Shop Steward who will be named at the pre-job conference. The Steward shall be capable of performing the required work the second worker hired and the last worker laid-off on any job site. The Laborers' Steward will be employed at all times that any laborers are employed on the project and will be paid for all time lost due to not having been notified by the Employer or the Employer's agent to report to work. He or she will be allowed sufficient time to perform his or her duties and will not be discharged, laid off, or transferred for any reason without prior approval of the Business Manager. The Union shall have the right to remove or replace any Shop Steward at any time. The Shop Steward is a working steward and shall not use his or her position as Shop Steward to avoid performance of his or her duties as an employee.

5.     The Steward shall be notified prior to any hiring or lay-off.

6.     All Shop Stewards must be certified by the Union before they may serve in this capacity. The requirements for certification will be established and maintained by the Union, in writing.

7.     The Shop Steward is not authorized to add or subtract from the terms of the Agreement or interpret the Agreement or take any other action that may cause this Agreement to be in violation of any federal or state laws or regulations.

8.     Authorized representatives of the Union shall be allowed to visit jobs during working hours to communicate with the Employer and employees but in no way shall such person(s) interfere with or hinder the progress of work.

9

9.    (a)    Employees injured at work shall be paid for time spent going to the doctor's office for treatment at the time of injury. If the doctor certifies in writing that the employee is unable to return to work that day, the injured employee shall be paid for the balance of the working day.

      (b)    The injured employee shall be allowed four (4) hours' time from work for additional visits to the doctor for injuries sustained while in the Employer's service without loss of pay. It shall be understood, however, that such visits during working hours shall be made only when no other arrangements can be made and an affidavit is received from the doctor stating the necessity for each visit.

## ARTICLE VII - MANAGEMENT RIGHTS

1.    The management of the job, and the direction of the working force, including but not limited to the right to hire, suspend or discharge employees other than the Shop Steward and the right to relieve employees from duty due to lack of work or other just cause, is vested exclusively in the Employer, subject to the other provisions of this Agreement, and applies only to employees other than the Shop Steward.

2.    No limitation shall be placed on the amount of work that an employee shall perform during the work day, nor shall there be any restrictions against the use of machinery or labor-saving devices.

## ARTICLE VIII - WORK CONDITIONS

1.    The Employer shall furnish all necessary tools that the employees are to use.

2.    At the time of hire or such later date as may be appropriate, employees covered by this Agreement shall be furnished with slipover rubber boots, rainsuits and hard hats that shall remain the property of the Employer and shall be returned at the termination of use or employment. In the event that an employee fails to return such equipment, he or she shall pay to the Employer $30.00 for a pair of rubber boots, $30.00 for a rainsuit, and $10.00 for a hard hat.

3.    The Employer shall supply rubber gloves for the performance of work necessitating their use.

4.    The Employer shall provide warm, suitable shelter of sufficient size where all laborers may eat their lunch and hang their clothing. The Employer shall also assume responsibility in case of loss of fire. No tools, building equipment or combustible material shall be stored therein. Employees shall be required to execute a verified proof of loss form, to be supplied by the Employer, in case of fire.

10

5.     The Employer shall provide and the laborers shall maintain clean and sanitary toilet and drinking facilities.

6.     The Union and the Employer expressly agree that a stable work force is required at all times in this seasonal industry and that the absence of individual employees has a serious impact on the Employer's project productivity and efficiency.

## ARTICLE IX - HOURS OF WORK

1.     The work week is defined as 12:01 a.m. on Monday through 12:00 p.m. on Sunday.

2.     Normal work day shall consist of eight (8) hours with one half (½) hour for lunch. The starting time shall not be changed from day to day.  The first shift each work day must start no sooner than 6:00 a.m. nor later than 9:00 a.m., except as may be otherwise mutually agreed upon by the Employer and Union.

3.     Two shifts may be worked in twenty-four (24) hours and shall be of equal duration and at the same rate.  However, in a two shift operation, were the combined number of hours worked by the two shifts is sixteen (16) or less, each shift shall be paid eight (8) hours pay at straight time.  Notwithstanding the foregoing provisions, when a shift is shut down by reason of completion of the shift work to be performed or conditions beyond the Employer's control, the affected shift shall be paid on the basis of the show-up time provisions contained herein Article X.  This clause is equally applicable to the three (3) shift provisions hereinafter contained in Section 4.  Thus, it is understood that there is no guarantee that on a given day, one shift might not vary due to weather, equipment breakdown, or changes in operation schedules.

4.     Three shifts may be worked in twenty-four (24) hours and shall be at the rate and duration as set forth below:

| | | |
|---|---|---|
| 1st shift | 8 hours work | 8 hours pay |
| 2nd shift | 7 hours work | 8 hours pay |
| 3rd shift | 7 hours work | 8 hours pay |

Each shift shall have one-half (1-1/2) hour for lunch. On the first shift, lunch shall be between noon to 12:30 p.m. When three (3) shifts are worked, the second and third shift shall be considered for payroll purposes as having been worked in their entirety on the same day on which the first shift started.  On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.  On multiple shift work, the shift schedules shall be arranged by mutual consent.

5.     Prior to the start of shift work, the Employer shall give forty-eight (48) hours notice to the Business Manager.  When the shift work to be performed shall be less than ten (10) working days in duration, prior agreement of the Business Manager shall be

11

required.  In the event of an emergency or directive of the letting agency, prior agreement for shift work of less than ten (10) working days duration is not required, but notice will be given to the Business Manager prior to the start of such shift work.

6.    One and  one-half (1-1/2) times the wage rate shall be paid for all work performed in excess of eight (8) hours in one day or forty (40) hours in one work week and for all work performed on Saturday between 12:01 a.m. through 12:00 p.m.  Double time will be paid for all work performed on Sunday between 12:01 a.m. through 11:59 p.m. and on the following holidays, but which are not paid holidays under this Agreement: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day.

7.    With respect to any project that is 100% federally funded, awarded by a federal agency, the payment of overtime after eight (8) hours will not apply.  Overtime will only be required to be paid after forty (40) hours of work  in one week. On all projects not one hundred percent (100%) federally funded, overtime pay is required after either eight (8) hours of work in one day of forty (40) hours of work in one week.

8.    All eligible employees shall be allowed time off to vote on Election Day in accordance with applicable law.

9.    A single irregular work shift can start at any time from 5:00 p.m. to 1:00 a.m. All employees when working a single irregular work shift on night work shall be paid an additional $1.00 per hour.  The provisions of this section will be effective for work bid on or after July 1, 2002.  It is understood and agreed that if the single irregular work shift language is not included in the NYS Department of Labor prevailing wage rate schedules, the premium is waived.

## ARTICLE X - SHOW-UP TIME

1.    Any laborer who reports for work at the regularly appointed starting time, unless he has been notified on the previous day that his services will not be required, shall be entitled to show-up time of four (4) hours at straight time.  The employees shall remain on the job for the four (4) hour period, unless otherwise directed by the Employer. Employees directed to stand-by beyond the four (4) hour period shall be paid show-up time plus such additional stand-by time.

2.    Employees reporting for work at starting time shall, if put to work, receive four (4) hours pay.

3.    Employees reporting for work at starting time shall, if they work in excess of four (4) hours, be paid for actual hours worked that day.

## ARTICLE XI - PAY DAY AND MODE OF PAYMENT

1.      Employees performing work under this Agreement shall be paid once a week on the job.  No more than six (6) days pay shall be withheld. The day selected as the first pay day on any job shall be the designated pay day until the completion of the job.   If the pay day falls on a holiday, payment shall be made on the work day preceding such holiday. On failure to pay on the regularly scheduled pay day, the Employer will pay to the Union a penalty of $100.00 per employee for each week the employee is not paid as provided herein. The employee may pursue all other legal remedies to which he or she is entitled to for the Employer's failure to pay on the regularly scheduled day. If an employee is not on the job site when pay is distributed because of any reason for which the Employer is responsible, the employee is allowed one hour with pay to retrieve his or her pay from the Employer's office.

2.      All wages shall be payable in lawful currency, enclosed in an envelope that shows the employee's name and Employer's name, regular hours worked, plus overtime hours worked, all lawful deductions, and the amount due or by a negotiable payroll check showing all of the above information drawn upon a commercial bank within the region payable upon demand at par.  In the event that a salary check is not honored by the bank on which it is drawn for any reason, the Employer shall pay the affected employee $100.00 and the Employer shall not be permitted to pay wages by check in the future unless it posts a bond to ensure the payment of wages.

3.      If any employee is discharged or laid off, all accrued wages shall be due and payable on the next regularly scheduled pay day.

## ARTICLE XII - LABORER FOREMAN

Laborer Foreman (grade, pipe, etc.), an agent of the Employer, shall be designated by and at the discretion of the Employer and shall be assigned to such duties and responsibilities as the Employer, the Dirt Superintendent or other supervisory personnel may determine in its or his or her sole discretion.  The Employer or the Employer's representative shall be the sole judge of whether such employees are qualified to perform the assigned work.  Laborer Foreman shall be paid one dollar ($1.00) above (b) rate.

## ARTICLE XIII - SUBCONTRACTING

1.      It is agreed that if the Employer subcontracts job site work falling within the terms of this contract, provisions will be made in each subcontract for the compliance by said subcontractor with terms, conditions of employment, wages, annuity, welfare, pension, education and training fund contributions not less than those contained in this Agreement.

2.      A subcontractor is defined as any person, firm, partnership, self-employed person or corporation who agrees, under contract, oral or written, with the general

13

contractor or his subcontractor to perform on the job site any part or portion of the work covered by this Agreement.

3.    An Employer, who is a party to and/or bound by the terms of this Agreement, shall not subcontract work covered by this Agreement to a firm, person or group where such firm, person or group is not a party to or bound by an Agreement with the Union when the subcontracted work begins.

4.    If the Employer accepts a contract or subcontract solely for work described in this Agreement, the Employer must perform all such work with the Employer's own employees and such contract or subcontract shall not be sublet. However, if the Employer has a general contract, the Employer may sublet such work to a contractor or subcontractor who is a signatory to or bound by an Agreement with the Union. Notice of the subletting of work described in this Agreement on any project shall be given to the Union before any persons are employed on such project. Such notice shall give the location of the project and the name and address of the Owner, Contractor and Subcontractor.

5.    Any employer who contracts out or sublets any work covered by this Agreement shall assume the obligations of any subcontractor for prompt payment of employees' wages, dues check-offs, any filing fees, and fringe benefit contributions, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

6.    The Employer agrees that it will not subcontract any work covered by this Agreement in order to circumvent the payment of wages and fringe benefits.

7.    The Employer agrees that it will not subcontract any work covered by this Agreement in order to circumvent the payment of wages and fringe benefits and the working conditions provided for in this Agreement.  The Employer and the Union hereby agree to the elimination of lumping.

8.    Off-site gravel or material pits, the material from which is used for a particular project covered by this Agreement, shall be operated under the terms of this Agreement when the pit is owned, leased, operated by or under the control of the Prime Contractor or another corporation or company of which the majority ownership is held by the Prime Contractor or its majority owner or owners.

ARTICLE XIV - SAFETY

1.    No employee shall be required or assigned to engage in any activity involving dangerous conditions of work or danger to person or property in violation of an applicable statute, court order, or governmental regulation relating to safety of person or equipment. If an employee determines an activity to be dangerous, the employee is permitted to refuse to engage in such activity and shall not suffer adverse job action for doing so. Disputes

14

regarding whether an activity is dangerous are not subject to the grievance procedure contained in Article XVIII.

2.     In the event that the Employer violates Section 1 above, a withdrawal by the Union of the services of the employee or employees engaged in the particular operation shall not be in violation of this agreement by the Union. Where the Union withdraws employees, and there is a dispute as to whether the activity at issue is dangerous which is ultimately resolved in favor of the Union, the Employer shall pay back to the striking employees for all time lost during the dispute.

3.     The Employer and the Union do hereby agree to work together to promote safety on the job for the benefit of all employees. Safety rules and regulations will be made known to all employees and the use of safety equipment will be continually promoted by both parties.

4.     (a)     The Union and the Employer agree that willful neglect and failure by an employee to obey company safety rules and regulations; or to obey safety rules, standards and regulations as prescribed pursuant to the Occupational Safety and Health Act or other governmental regulation or legislation; or to use properly such safety devices or equipment as are provided by the Employer shall be just cause for discharge and it shall be the decision of the Union as to whether recourse will be had to grievance procedure of this Agreement.

(b)     Union agrees to cooperate with the Employer in encouraging employees to observe the safety regulations prescribed by the Employer and to wear properly and utilize safety equipment as required by the Employer and to work in a safe manner.

(c)     The Union further agrees that Union representatives visiting job sites shall obey all company safety rules and regulations and shall obey all safety rules, standards and regulations prescribed pursuant to the Occupational Safety and Health act or other governmental regulation or legislation, and shall wear and use properly all safety devices or equipment employees on the job site are required to wear and use.

5.     No provision of this Agreement shall supercede any municipal, state or federal law which imposes more stringent requirements as to safety, sanitary or general work conditions than are imposed by this Agreement.

## ARTICLE XV - PENSION, WELFARE, S.U.B., ANNUITY, TRAINING FUNDS

1.     (a)     The Employer shall pay monthly to the Trustees of the Buffalo Laborers Welfare Fund the hourly rate specified in Article XXII for all hours worked by employees covered by this Agreement, for the purpose of providing benefits for death, accident, health, medical and surgical care, hospitalization and such other forms of group

15

benefits for employees covered by this Agreement, their spouses, and their eligible children, as the Trustees in their sole and absolute discretion, determine. It is the intention of the parties that no such contributions shall be required on the premium portion of wages, i.e. contributions shall be based upon hours worked and not upon wages paid. On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

(b)     Welfare coverage shall also be provided for all eligible employees of the Unions and Fringe Benefit Funds, provided contributions are made to the Funds by their employers on their behalf.

2.     (a)     The Employer shall pay monthly to the Trustees of the Buffalo Laborers Pension Fund the hourly rate specified in Article XXII for all hours worked by employees covered by this Agreement.  Contributions to the Pension Funds shall be utilized for the purpose of providing pension and other benefits for the eligible employees covered by this Agreement as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of wages.  On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

(b)     Pension coverage shall also be provided for all eligible employees of the Unions and the Fringe Benefit Funds provided contributions are made to the Funds by their employers on their behalf in amounts no less than are paid by Employers covered by this Agreement.

3.     The Employer shall pay monthly to the Trustees of the Buffalo Laborers Training Fund the hourly rate specified in Article XXII for all hours worked by employees covered by this Agreement, for the purpose of providing education and training in the various trades covered by this Agreement. It is the intention of the parties that no such contributions shall be required on the premium portion of wages.  On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

4.     The Employer shall pay monthly to the Trustees of the Buffalo Laborers Supplemental Unemployment Benefit Fund the hourly rate specified in Article XXII for all hours worked by employees covered by this Agreement. Contributions to the Supplemental Unemployment Funds shall be utilized for the purpose of providing benefits to eligible employees in the event of unemployment. It is the intention of the parties that no such contributions shall be required on the premium portion of wages. On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

5.     The Employer shall pay monthly to the Trustees of the Buffalo Laborers Annuity Fund the hourly rate specified in Article XXII for all hours worked by employees covered by this Agreement. Contributions to the Annuity Funds shall be used for the purpose of providing an annuity to eligible employees. On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

16

6.     All Fringe Benefit Funds provided by this Agreement shall be jointly administered by Trustees designated equally between the applicable Union and the Association. All amendments necessary to effectuate the provisions of this Article shall be made in the trust documents, including provision that the concurrences of one employer-designated Trustee and one Union-designated Trustee of any fund shall be necessary for the approval of any action to be taken by such Trustees.

7.     The Employer agrees to contribute the amount per hour set forth in this Article for each actual hour worked and the Employer agrees to contribute the amount per hour set forth in this Agreement for each hour paid pursuant to Article X, Section 1 of this Agreement.  On second and third shift work, fringe benefits shall be contributed on an hours-paid basis for the first eight (8) hours.

8.     (a)     If the Employer is delinquent in the payment of fringe benefit contributions to the Funds, the Employer shall pay, in addition to the delinquent fringe benefit contributions, interest on the unpaid amounts from the day due until the date of payment at the rate prescribed under Section 6621 of Title 26 of the United States Code. If the funds bring an action to recover the interest on delinquent fringe benefit contributions, the Employer is obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

(b)     In the event that formal proceedings are instituted before a Court of competent jurisdiction to collect delinquent contributions, a court renders a judgment in favor of the Funds, the Employer shall pay to the Funds (i) the unpaid contributions; (ii) interest on unpaid contributions at the rate prescribed under Section 6621 of Title 26 of the United States Code; (iii) interest on the unpaid contributions as and for liquidated damages; (iv) reasonable attorneys' fees; and (v) such other legal or equitable relief as the Court deems appropriate.

(c)     The Employer agrees that in the event payment to the Union or the Funds by check results in the check being returned without payment, the Employer shall pay $250.00 to the Union or the Funds. The Union or the Funds do not waive any right to any other liquidated damages to which they may be entitled.

9.     (a)     Each employer shall furnish the Trustees of the respective funds with periodic reports as required by the Fund showing the names, social security numbers, hours worked and job location for each employee performing work covered by this Agreement.

(b)     In the event that no workers are employed during a report period, a negative report and/or a final report shall be filed.

(c)     Monthly reports are due the 15th day of the month following the month on which contributions are being made.

17

10.   (a)   The books and records of the Employer shall be made available at all reasonable times for inspection and audit by the accountants or other representatives of the Funds including, without limitation, all payroll sheets, W-2 forms, New York State Employment Reports, Insurance Company reports and supporting checks, ledgers, general ledger, cash disbursement ledger, vouchers, 1099 forms, evidence of unemployment insurance contributions, payroll tax deductions, disability insurance premiums, certification of workers compensation coverage, and any other items concerning payroll(s). In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the employer shall also be made available at all reasonable times for inspection and audit by accountants or other representatives of the Funds. The Employer shall retain, for a minimum period of six (6) years, payroll and related records necessary for the conduct of a proper audit in order that a duly designated representative of the Trustees may make periodic review to confirm that contributions owed pursuant to this Agreement are paid in full. The Funds shall bear the cost of an inspection and audit, except where the audit discloses a delinquency in excess of 10% of the prior year's contribution or $2,000.00, whichever is greater.

(b)   In the event that the Trustees have made a reasonable request and the Employer fails to produce its books and records necessary for a proper audit, the Trustees, in their sole discretion, may determine that the Employer's monthly hours subject to contributions for each month of the requested audit period are the highest for any month during the last twelve months' audited, or during the last twelve months for which reports were filed, whichever monthly number of hours is greater. Such determination shall constitute presumptive evidence of delinquency. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for an audit.

(c)   In the event the Employer fails to produce the books and records necessary for an audit, the Employer shall pay a penalty of $450.00 a day for each day. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for audit. In the event the Funds bring an action to obtain an audit of the Employer's books and records, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

11.   (a)   The Employer shall post and maintain a bond to ensure payment of contributions to the Fringe Benefit Funds set forth in this Article of the Agreement ("Fringe Benefit Funds") and remittance of dues check-offs to the Union. The amount of the bond shall be determined by the number of hours of work performed by the employees of the Employer covered by this Agreement in the prior contract year. The amount of the bond shall be as follows:

| Number of Covered Hours | Bond |
| --- | --- |
| 0 to 1,999 | $ 3,500.00 |
| 2,000 to 4,999 | $ 7,500.00 |

18

| | |
|---|---|
| 5,000 to 9,999 | $15,000.00 |
| 10,000 to 19,999 | $25,000.00 |
| 20,000 or more | $35,000.00 |

In the alternative, Employers may place a certificate of deposit, in an amount of the applicable bond, in an account controlled by the Trustees, to ensure payment of contributions to the Fringe Benefit Funds and remittance of dues check-offs to the Unions, provided that the interest from such certificate of deposit shall belong to the Employer. The Employer agrees to execute all forms required by the Fringe Benefit Funds or the Union in connection with the posting of a certificate of deposit in the place of a bond.

(b)    In the event a deficiency should be determined by an audit of the Employer's books and records, the Union in its sole and absolute discretion may require the Employer to post and maintain a bond in the amount of twice the audited deficiency within thirty (30) days of receiving notice from the Union or the requirement to post and maintain such a bond.

(c)    In the event the Trustees receive payment either on a bond or through forfeiture of a certificate of deposit under this Section and said payment is insufficient to satisfy the entire deficiency in the payment of contributions to the Fringe Benefit Funds and in remittance of dues check-offs to the Union, then the Trustees shall make a pro rata payment to each of the Fringe Benefit Funds and to the Union in an amount equivalent to the percentage of the total deficiency received by the Trustees through forfeiture of the bond or certificate of deposit.

(d)    Joint venturers shall furnish the Union with a rider from their respective surety company confirming that their respective bonds protect the Union and the Funds during the period of the joint venture.

12.    The parties to this Agreement recognize that the skills of the laborer constitute an apprenticeable trade. Whereas the NYS Department of Labor has approved apprentice standards for laborers, it is understood and agreed that the Employer consents to the institution by the Union of an approved Laborers Apprentice Training program.

## ARTICLE XVI - STATUS QUO ON CERTAIN EQUIPMENT

1.    The parties hereto recognize that the operation of certain equipment and work assignments may raise questions regarding jurisdiction of work in areas of the local unions party to this Agreement. The equipment involved is:

(a)    Hydraulic Seeder
(b)    Stump Remover
(c)    Hydraulic Motorized Pin Roller
(d)    Bo Mag walk-behind type roller on asphalt

19

2.      Pending final determination of the jurisdiction of the above equipment, such equipment and the operation thereof shall remain "status quo".

## ARTICLE XVII- STRIKES AND LOCKOUTS

1.      There shall be no strikes, walkouts, picketing, work stoppages, slowdowns, boycotts or other disruptive activity of a similar nature at a job site of, or otherwise directed at any Employer during the term of this Agreement, and there shall be no lockouts by an Employer, except:

> When the Union concludes that employees on any job have not been paid, are being paid less than the rate of wages prescribed in this Agreement, or the Employer is in arrears on fringe benefit contributions payable to the Trust Funds set forth in this Agreement or in the remittance of dues check-offs to the Union as proscribed in this Agreement or any modification of this Agreement, as hereinafter provided.

> When the Employer has failed to produce its books and records for inspection and audit by the Funds.

> When the Shop Steward is discharged without prior approval by the Business Manager.

> When an employee is discharged for his or her Union membership or activity.

> When the Employer has required an employee to work under dangerous or unsafe conditions.

> When the Employer has subcontracted work covered by the Agreement to a firm, person or group that is not party to or bound by this Agreement.

## ARTICLE XVIII - GRIEVANCE AND ARBITRATION

1.      The parties hereto agree that if any dispute arises as to any of the terms of this Agreement during the life of same other than disputes regarding the Employer's fringe benefit contributions, dues check-off, wage, and NYLPAC obligations; the duration of this Agreement; or any jurisdictional disputes, or except as otherwise provided in this agreement, there shall be no cessation, stoppage of work or lockout for any reason whatsoever, but such matters in controversy or dispute, if any, shall be handled as follows:

(a)      Should any dispute arise concerning the interpretation or application of any clause in this Agreement, directly or indirectly, other than those relating to the Employer's wage, fringe benefit, and dues check-off obligations, the duration of this Agreement, or jurisdictional disputes, the Union shall have the sole jurisdiction to decide such dispute. The decision of the Union shall be binding upon the Employer and shall be

20

complied with by the Employer within twenty-four hours.  Should any Employer fail to comply with the decision, the said Employer shall lose all rights and privileges under this Agreement. The Union, in the investigation of such a dispute, may subpoena witnesses and the books and records of the Employer. The Employer shall, at all times, keep records of all payroll, canceled vouchers and proper books showing the details of any and all operations which may affect this Agreement. The Union shall have the right to demand the production of such records at any time, whether or not a dispute exists.

(b)     Whenever any Employer has been found guilty by the Union of any violation, the Union shall have the right to remove workers from such Employer's jobs until it first complies with such rules and regulations of this Agreement as have been violated. Should any Employer continue to violate this Agreement, the Union shall be free to take any action it deems necessary.

## ARTICLE XIX - DEDUCTIONS

1.     The Employer shall deduct from the basic wage rate of employees covered by this Agreement, the amounts hereinafter set forth in Article XXII, for each actual hour worked by such employees.

2.     No deductions shall be made for any such employee unless the employee has deposited with the Employer his copy of an executed authorization form, which shall in no event be irrevocable for a period of more than one (1) year of the termination date of this Agreement, whichever shall be the less.

3.     Executed copies of the authorization cards will be kept on file by the Union and the Employer.

4.     The Employer assumes no obligations with respect to the obtaining of authorization cards, it being understood that this is a duty and obligation of the Union.

5.     With respect to any such employee for whom authorization cards have not been furnished, the gross basic wage rate appearing here-after at Article XXII shall be paid to the man on a straight and/or time and one-half basis as shall be applicable under this contract.

6.     Deduction shall be made in the first full payroll period following the furnishing of authorization cards.

7.     The Union shall indemnify and save the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken or not taken by the Company in reliance upon authorization cards furnished by the employees and/or Union.

21

8.     The Employer agrees to deduct and transmit to the New York State Laborers' Political Action Committee ten cents ($.10) for each hour worked from the wages of those Local 210 Buffalo employees who have voluntarily authorized such contributions on the form provided for that purpose by the Union. These transmittals shall occur monthly, and shall be accompanied by a list of the names of those employees for whom such deductions have been made, and the amount deducted for each such employee. The Employer shall retain one (1%) percent of the gross proceeds from the check off as reimbursement for the Employer's cost in administering this check off. The union agrees to indemnify and hold harmless the Employer from any and all claims, actions and/or proceedings arising out of said New York State Laborer's Political Action Committee.

## ARTICLE XX - EQUAL EMPLOYMENT OPPORTUNITY

1.     The Employer and the Union agree that there will be no discrimination against any employee or applicant for employment, with respect to race, creed, color, national origin, sex, age, handicap, marital status, veteran status, sexual orientation, affectional preference or union membership in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff and termination, and all other items and conditions of employment except as provided by law.

## ARTICLE XXI SAVINGS CLAUSE

1.     (a)     In the event that any Federal or State Court shall at any time decide that any clause or clauses of this Agreement is or are void or illegal, such decisions shall not invalidate the other portions of this Agreement, but such clause shall be stricken out and the remaining portion of this Agreement shall be considered binding between the parties hereto. Nothing contained in this Agreement shall be construed to deprive any one or more individual laborer from pursuing whatever civil or criminal remedies they may have under the law for the collection of their wages, or any part thereof.

(b)     Any provision of this Agreement which provide for Union security or employment in a manner and to an extent prohibited by any law of the determination of any governmental Board or Agency shall be and hereby are of no force or effect during the term of any such prohibition. It is understood and agreed, however, that if any of the provisions of this Agreement which are hereby declared to be of no force or effect because of restrictions imposed by laws is or are determined either by Act of Congress of other legislative enactment, or by a decision of the Court of highest recourse, to be legal and permissible, then any such provision of this Agreement shall immediately become and remain effective during the remainder of the term of this Agreement. The Union reserves the right to renegotiate any of the provisions of this Agreement which may be of no force or effect.

## ARTICLE XXII - WAGES

1.   A Laborer shall be paid for the entire day at the rate applicable to the highest classification in which he has worked that day.

2.   Highway/Heavy Contract Laborer:

    (a)   Job Classifications:

        Group A:   Basic, drill helper, flagman, outboard and hand boats, demolition worker,  nurseryman, IBC barriers (except on structures), guard rails, road markers.

        Group B:   Bull float, grade checker,  chain saw, concrete aggregate bin, concrete bootmen, gin buggy, hand or machine vibrator, jack hammer. mason tender, mortar mixer, pavement breaker, handlers of all steel mesh, small generators for laborers' tools, installation of bridge drainage pipe, pipe layers, vibrator type rollers, tamper, drill doctor, tail or screw operator on asphalt paver, water pump operators (2" and single diaphragm), nozzle (asphalt, gunite, seeding, and sand blasting), laborers on chain link fence erection, rock splitter and power unit, pusher type concrete saw and all other gas, electric, oil and air tool operators, wrecking laborer, and laser man.

        Group C:   All rock or drilling machine operators (except quarry master and similar type), acetylene torch operators, asphalt raker, powderman and welder.

        Group D:   Blasters, curb & flat work form setter (except on structures), stone or granite curb setters and stone cutter.

    (b)   Wages per hour:

        Group A:   $22.96
        Group B:   $23.16
        Group C:   $23.36
        Group D:   $23.56

Effective July 1, 2005, $1.35 per hour gross increase for each classification.

23

Effective July 1, 2006-June 30, 2007, $1.35 per hour gross increase for each classification.

Effective July 1, 2007-June 30, 2008, $1.45 per hour gross increase for each classification.

For all deleader & asbestos work, add $1.00 to Group A rate.

For all hazardous waste work, add $2.00 to Group A rate.

(c)  Supplemental Benefits per hour:

| | |
|---|---|
| Welfare: | $7.56 |
| Pension: | $4.26 |
| Annuity: | $1.00 |
| Training: | $0.58 |
| LECET: | $0.10 |

(d)  Deductions per hour:

Dues deduction:  6% of gross wages for each hour worked PLUS $0.10 per hour worked.

Political Action deduction:  $0.10 deducted from wages for each hour worked.

3.   Sewer/Water Laborer:

(a)  Job Classification:

Group A:   Basic, flagman, top man, wreckers

Group B:   Foundation, rod carriers, plaster tender, scaffold bootman, pneumatic, gas, electric. tool operator. jackhammer, chipping guns

Group C:   Mortar mixer, over 8 feet in depth

Group D:   Pavement formsetter, steelburner, caisson, wagon drill operator, pipelayer, swing scaff

Group E:   Utility pave driver, laser operator

Group F:   Blaster

24

(b)     Wages per hour:

Group A      $22.96
Group B      $23.06
Group C      $23.11
Group D      $23.21
Group E      $23.56
Group F      $23.96

Effective July 1, 2005, $1.35 per hour gross increase for each classification.

Effective July 1, 2006-June 30, 2007, $1.35 per hour gross increase for each classification.

Effective July 1, 2007-June 30, 2008, $1.45 per hour gross increase for each classification.

(c)     Supplemental Benefits per hour

Welfare:      $7.56
Pension:      $4.26
Annuity:      $1.00
Training:     $0.58
LECET:        $0.10

(d)     Deductions per hour:

Dues deduction: 6% of gross wages for each hour worked PLUS $0.10 per hour worked.
Political Action deduction: $0.10 deducted from wages for each hour worked.

NOTE: The basic wage rate includes the amount to be deducted for each actual hour worked for DUES AND POLITICAL ACTION. Dues and Political Action Deductions per hour upon receipt of signed authorization cards from employees. The 6% dues deduction will be on gross wages exclusive of fringe benefits.

4.     DRILLS - Individual wagon drills, trackmounted drills, jack-leg drills and multiple type drills shall require a drill helper except that the Union and the Employer recognize that in certain cases one helper may be able to service more than one drill.  In such cases, the manning shall be pursuant to a project agreement between the Union and the Employer.

25

5. The wages rates for Foremen covered by this Agreement are as follows:
   (a)   LABORER FOREMEN - $1.00 above (b) rate;

   (b)   Any Foremen covered by this Agreement may be employed on a weekly basis at a salary agreeable to the Employer and the Foremen.

6. WORK AT HAZARDOUS WASTE SITE. When an employee covered by this Agreement performs hazardous waste removal work on a State and/or Federally designated waste site, and where relevant State and/or Federal regulations require employees to be furnished, and those employees use or wear required forms of personal protection, then in such case an employee shall receive the basic hourly rate plus $2.00 per hour.

7. When an employee covered by this Agreement performs asbestos removal work or deleader work, such employee shall receive the basic hourly rate plus $1.00 per hour.

8. All employees when working a single irregular work shift on night work shall be paid an additional $1.00 per hour when posted in the NYS Department of Labor prevailing wage scale effective for July 1, 2002.

## ARTICLE XXIII - SUCCESSORS

1. If the Employer or any of its owners forms or acquires by purchase, merger or otherwise, an ownership interest in another company performing bargaining unit work within the jurisdiction of the Agreement, the Agreement shall cover such other company and the employees of such company performing bargaining work shall be an accretion to the bargaining unit within the jurisdiction of this Agreement.

2. If the Employer or any of the Employer's owners forms or acquires by purchase, merger or otherwise, an ownership interest in another company performing bargaining unit work within the jurisdiction of this Agreement, this Agreement shall cover such other company, and the Employer and such other company shall be jointly and severally liable for each other's obligations under this Agreement.

3. A corporate contractor party to this Agreement and/or the majority stockholders of such corporation shall promptly notify the Union in writing of any such other corporation as herein above described in Section 2, which corporation is in existence at the time of the effective date of this Agreement or that may come into existence during the life of this Agreement, stating its full corporate name and address.

4. In the event that all or part of the Union's trade or geographic jurisdiction as defined by the terms of this Agreement is transferred to another local union affiliated with L.I.U.N.A., such local union shall be deemed a successor to Local 210 and this Agreement shall cover such other local union with regard to the work within the transferred jurisdiction.

## ARTICLE XXIV - DRUG TESTING

1.    The Employer may elect to implement a pre-employment, illegal drug screening program. The Employer will notify the Union, in writing prior to implementing a pre-employment illegal drug testing policy, of the rules by which the program will operate. The Employer will operate the pre-employment, illegal drug screening program strictly in compliance with the rules it promulgates. Any changes in these rules will be provided to the Union thirty (30) days in advance of the effective date.

2.    "Illegal drug" as used in this Article of the Agreement includes only the following five (5) drugs or drug classes: marijuana, cocaine, opiates, phencyclidine (PCP), and amphetamines. The Employer may only test for illegal drugs.   If the Employer tests for anything other than illegal drugs as defined by this Article, the Employer will be liable for such action to the full extent of the law.

3.    If an Employer establishes a pre-employment illegal drug testing policy pursuant to this Article of the Agreement, the Employer must provide each applicant with written information, prior to administering the illegal drug test, regarding the impact of drug use on job performance. Additionally, the Employer must provide the applicant with written notice, prior to administering the illegal drug test, of the manner in which the test is conducted, the reliability of the test performed, what the test can determine, and the consequences of testing positive for illegal drug use.  The applicant shall acknowledge in writing that he or she received the required notice and information. Applicants who request a second test are liable for the cost of the second illegal drug or analysis or reanalysis test if requested unless the second test is negative, in which case the Employer shall reimburse the applicant for the cost of the test.

4.    If an Employer establishes either a pre-employment or post-employment illegal drug testing policy pursuant to this Article of the Agreement, the Employer shall make every reasonable effort to safeguard the privacy of each applicant or employee. All testing shall be performed by a laboratory that is licensed, inspected and in good standing with New York State.  The laboratory shall confirm its suspected positive results with a scientifically accepted method, retain all positive samples for a minimum of ninety days, secure its sample against any reasonable possibility of tampering, participate in an outside proficiency testing program to monitor its quality performance, and be willing to defend its procedures with expert testimony.

5.    To the extent that an Employer is required by Federal, State or Local laws, rules and/or regulations to subject its employees to illegal drug testing, the Union agrees to permit illegal drug testing of employees in compliance with the relevant law or regulation. Under no other circumstances shall any form of drug testing of employees be permitted. The Employer agrees that it will not subject any employee to illegal drug testing without first notifying the Union of the existence and terms of the Federal, State or Local laws, rules and/or regulations requiring such testing and providing the Union with a copy of the applicable provisions of said laws, rules and/or regulations.

6.     If an Employer establishes a post-employment illegal drug testing policy pursuant to this Article of the Agreement, it is required that an employee be advised that s/he must undergo a drug screen, i.e., urine test, at least seven days before the testing is administered. Employees shall be provided with written information concerning the impact of illegal drug use on job performance. In addition, the Employer shall inform the employees in writing of the manner in which the tests are conducted, the reliability of the test performed, what the test can determine, and the consequences of testing positive for illegal drug use. This information shall be provided at least seven days prior to the illegal drug test. The employee shall give a written acknowledgment of the explanation.

7.     Applicants or employees whose test result is positive for illegal drugs have the right to request, within 48 hours of the notification to the employee, reanalysis of the sample. If the applicant fails to request reanalysis or, if upon reanalysis the test result is still positive for illegal drugs, the applicant may be denied employment with the Employer. The decision of whether or not to hire an applicant based upon the results of preemployment illegal drug testing shall be at the sole discretion of the Employer. If the employee fails to request reanalysis or, if upon reanalysis the test result is still positive for illegal drugs, the employee shall be denied employment with the Employer. However, applicants or employees whose test result is positive for illegal drugs and who are in a bona fide rehabilitation program will not be denied employment for that reason, so long as they are capable of performing their work satisfactorily.

8.     Drug-related disputes that are not pre-employment pursuant to this Article of the Agreement shall be subject to the Grievance and Arbitration Procedure set forth in Article XVIII of the Agreement. Under no circumstances will the Employer or the Union be informed, beyond a negative or positive outcome, of any illegal drug testing result unless a grievance is filed, in which case all relevant information regarding the test results, testing methods and chain of custody will be provided to both the Union and the Employer.

9.     The Employer shall bear all costs associated with post-employment illegal drug testing. The Employer shall reimburse the employee for all travel expenses. Employees will be paid for all time spent submitting to the test.

10.    The Employer is not permitted to establish or implement any illegal drug testing policy other than that permitted by this Article of the Agreement.

11.    Any section or subsection of this Article which provide for drug testing in a manner and to an extent prohibited by any law or the determination of any Governmental Board or Agency shall be and hereby is of no force or effect during the term of any such prohibition. It is understood and agreed, however, that if any section or subsection of this Article which is declared to be of no force or effect because of restrictions imposed by laws is determined by Act of Congress, other legislative enactment, or a decision of the Court of highest recourse to be legal or permissible, such section or subsection shall immediately become and remain effective during the remainder of the term of this Agreement.

28

12.    In the event a dispute arises, legal action commences, or other damages both result any employer activity under this Article of the Agreement, the Employer shall hold harmless and indemnify the Union for any and all liabilities that may incur.

## ARTICLE XXV - TUNNEL WORK

This Article is limited to terms and conditions that apply solely to tunnel work as defined herein.  All other terms and conditions in the Agreement apply to tunnel work as well.

1.    Tunnel work shall be defined for this Article as including all jobs that are both in excess of 84" in diameter and 700 feet in length.  Should a shaft or cofferdam from the top of the rock line, under this Article be part of a larger general contract, only the shaft, cofferdam or tunnel below the top of the rock line part shall be done under this Article and the remainder under the appropriate contract or contracts.

2.    This Article shall cover the construction, alteration, repair and demolition of tunnels, subways, shafts, raises, slopes and drifts including the lining of same.  It shall also include placing of all pipes, conduits and rails in the tunnel.

3.    This Article shall apply to any employee who performs the work as defined in Sections 4, 5 and 6 below within the recognized jurisdiction of Laborers' International Union of North America Local Union No. 210.

4.    The Employer agrees to assign all such work as specified below only to employees covered by this Article:

(a)    It is agreed that Laborers' work shall include and not be limited to, heading foremen, shaft foremen, rod foremen, electrician foremen, rigging foremen, iron foremen, caulking foremen, form foremen, concrete foremen, grout foremen, cement finishing foremen, cleanup foremen, track foremen. blasters, structural steel erection, reinforcing steel erection, welders, fence erectors, sheet buckerups, riggers, precast erectors, elevator erectors, lancers, erection of catwalks and stairways, demolition workers, erecting of all guard rails, piledriving, crib work of all kinds, firemen, lagging and bracing regardless of method, handling, placing and driving of all sheetpile regardless of method. All bricklaying, all stone, block, laying and tending of same, all cement finishing, rubbing and curing, the placing and handling of all tile, marble and terrazzo, all carpentry work, maintaining of all communication systems during construction, the handling, placing, and laying of all track, drill runners, all ironworkers, all maintenance workers, changehouse attendants, powder carriers, all safety men, all caulking, all chucktenders, nippers, brake men, derail men, cable men, hose men, gravel men, the handling, placing, erecting and dismantling of all forms regardless of method, bottom bell men, top bell men, all signal men, movers, concrete workers, shaftmen, mole nippers, power watchmen, all drilling

regardless of method, the cutting, drilling, and installation of material used for timbering, and retimbering, assembly and installation of multi-plate, Linear plate, rings, mesh, mats, or forms for the shaft, including the setting of rods for the same, pouring, pumping, creting or guniting of concrete or any aggregate, hydraulic jacking placing and constructing of shields, maintain operate and service air locks, air lines, grout machines, heading and bench drilling, heading and bench driving, hydraulic pressure on shield, hydraulic wrench, jackhammers, jumbos, pneumatic caissons, concrete and crete placers, public safety, accumulator for shield slushers, light boxes, collar bracing lighting, wagon drills, wall plates, water handling repair rooms, and conduit, all miners, miner helpers, the splitting and making of primers, all mucking and dumping, handling, installing and extending all water, air, and vent lines, handling of sponge pumps in wet headings, swampters, watchmen and guards, communications and electrical installation, access shafts, drop air shafts, transit stations located in tunnel areas.

(b)     All classifications listed elsewhere in this Agreement which are not listed under this Article and Section shall be included in the coverage and description of work just as though incorporated in full in this Article and Section.

(c)     The jurisdiction in subsections (a) and (b) of this provision shall commence at the top of the rock line for tunnels, shafts and cofferdams.

5.     In compressed air all work underground or in compression chambers including tending of other air lock. All work in compressed air construction including but not limited to groutmen, trackmen, blasters, shield drivers, miners, brakemen, miners' helpers, lock tenders, mucking machine operators, motor men, gauge tenders, rodmen, compressed air electricians, setting of line plate and rind sets, drill runners, powdermen or blasters, air hoist operators, form men, concrete blower operators, cement operators, power knife operators, erector operators, steel setters, cage tenders, skinners, track layers, dumpmen, diamond drillers, timbermen and retimbermen, cherry pickmen, nippers, chucktenders and cable tenders, vibratormen, jetgunmen, gunnite nozzlemen, gunmen, reboundmen, and all other work connected therewith.

6.     Employees who perform work of a complex and hazardous nature such as: welders, riggers, structural steel erectors, etc., and any employee sixty (60) years of age or older and who will perform work below street level, are required to submit to a physical examination by an employer selected doctor. The Employee will have the right to contest the findings of that doctor by examination by a doctor selected by the Union. The cost of that doctor will be paid by the Employee.

7.     The following job classifications and corresponding wage and fringe benefit contribution rates, shall apply to all work performed under this Article of the Agreement.

(a)     Job Classifications:

30

Class A:  Mole nipper, powder handler, changehouse attendant and top laborer

Class B:  Air spade, jackhammer, pavement breaker

Class C:  Top bell

Class D:  Bottom bell, side or roofbelt driller, maintenance men, burners, block layers, rodmen, caulkers, miners helper, trackmen, nippers, derailmen, electrical cablemen, hosemen, groutmen, gravelmen, form workers, movers and shaftmen, conveyor men

Class E:  Powder monkey

Class F:  Blasters, ironmen and cement worker, miner, welder, heading driller

Class G:  Steel erectors, piledriver, rigger

(b)     Wages per hour:

Class A   $23.46
Class B   $23.61
Class C   $23.71
Class D   $24.21
Class E   $24.31
Class F   $24.71
Class G   $24.96

Additional $2.00 per hour to basic rate for hazardous waste sites

Additional $1.00 per hour to basic rate for deleader and asbestos worker.

Effective July 1, 2005, $1.35 per hour gross increase for each classification.

Effective July 1, 2006 - June 30, 2007, $1.35 per hour gross increase for each classification.

Effective July 1, 2007 - June 30, 2008, $1.45 per hour gross increase for each classification.

(c)     Supplemental Benefits per hour:

31

Welfare        $7.56
Pension        $4.26
Annuity        $1.00
Training       $0.58
LECET          $0.10

(d)     Deductions per hour:

Dues Deduction: 6% of gross wages for each hour worked PLUS $0.10 per hour worked.

Political Action deduction: $0.10 deduction from wages for each hour worked.

*Dues and Political Action Deductions per hour upon receipt of signed authorization cards from employee. The 6% dues deduction will be on gross wages exclusive of fringe benefits.

## ARTICLE XXVI - APPRENTICES

1.     If available, the twelfth (12th) Laborer on any job site shall be an apprentice enrolled in the Local 210 apprenticeship program. Notwithstanding the foregoing, there shall be no apprentices on any job site unless at least three (3) journeymen are working at the jobsite, this minimum ratio of journeymen to apprentices shall be observed by the Employer on all jobsites.

2.     Apprentice Wage Progression In Hours As A Percentage Of Journeyman's Rate:

| Hours | Wages |
|-------|-------|
| 1-500 | 55% |
| 501-1000 | 60% |
| 1001-1500 | 65% |
| 1501-2000 | 70% |
| 2001-2500 | 75% |
| 2501-3000 | 80% |
| 3001-4000 | 90% |

32

## ARTICLE XXVII - DURATION AND TERMINATION

It is agreed by both parties that all the conditions of this Agreement shall remain in full force and effect from April 1, 2005 to March 31, 2008 and during each calendar year thereafter, unless on or before the 31st day of January, 2008, or any year thereafter, written notice of change in this Agreement be served by either party upon the other party.

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly subscribed by their duly authorized representatives the day and the year first above written.

**EMPLOYER**

_Comet Flasher, Inc._
Print Firm Name

By: _James L Casey_
    Signature

_James L. Casey_
Print Name and Title

_1 Babcock St_
Street Address

_Buffalo, NY 14210_
City, State, Zip Code

_716 - 821 - 9595_
Area Code, Telephone Number

_716 - 821 - 7742_
Area Code, Fax Number

**LIUNA LOCAL 210**
**2750 Harlem Road**
**Cheektowaga, New York 14225**
**telephone: (716) 895-5311**
**fax: (716) 895-5282**

By: _____
  Harley Locking, Business Manager

Date: _1-26-07_

33